**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

_____

| | |
|---|---|
| **JAMES D. WOMACK,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )　　**CIVIL NO. 3:10CV165** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

_____)

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This matter is before the Court for a report and recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B) on cross-motions for summary judgment.[1]  Plaintiff, James D. Womack, seeks

judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner

denying his applications for Social Security Disability ("DIB") and Supplemental Security

Income payments ("SSI").  The Commissioner's final decision is based on a finding by an

Administrative Law Judge ("ALJ") that Plaintiff was not disabled as defined by the Social

Security Act ("the Act") and applicable regulations.

For the reasons discussed herein, it is the Court's recommendation that Plaintiff's motion

for summary judgment (docket no. 12) and motion to remand (docket no. 13) be DENIED; that

---

[1] The administrative record in this case has been filed under seal, pursuant to Local Civil
Rules 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal
identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth
(except for year of birth), and any financial account numbers from its consideration of Plaintiff's
arguments and will further restrict its discussion of Plaintiff's medical information to only the extent
necessary to properly analyze the case.

Defendant's motion for summary judgment (docket no. 15) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed for SSI and DIB on April 4, 2008, claiming disability due to "neck, shoulder, right arm," with an alleged onset date of January 8, 2008. (R. at 128, 134, 145, 149.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[2] (R. at 77-82; 89-99.) On June 3, 2009, accompanied by counsel, Plaintiff testified before an ALJ. (R. at 29-72.) On September 30, 2009, the ALJ denied Plaintiff's application, finding that he was not disabled under the Act where Plaintiff retained the residual functional capacity to perform his past relevant work, either as actually performed or as generally performed in the national economy. (R. at 9-26.) The Appeals Council subsequently denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1-4.)

## II. QUESTION PRESENTED

Is the Commissioner's decision that Plaintiff is not entitled to benefits supported by substantial evidence on the record and the application of the correct legal standard?

## III. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the

_____

[2] Initial and reconsideration reviews in Virginia are performed by an agency of the state government–the Disability Determination Services (DDS), a division of the Virginia Department of Rehabilitative Services–under arrangement with the SSA. 20 C.F.R. Part 404, Subpart Q; see also § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

record and whether the proper legal standards were applied in evaluating the evidence.  Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971); Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

In order to find whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary.'"  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (quoting Craig, 76 F.3d at 589).  In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'"  Breeden v. Weinberger, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)).  The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed.  Perales, 402 U.S. at 390.  While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required in order to determine if a claimant is eligible for benefits.  20 C.F.R. §§ 416.920, 404.1520; Mastro, 270 F.3d at 177.  The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were

applied, and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" (SGA).[3] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. Id. If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); see also 20 C.F.R.404.1520(c). In order to qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c). At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can

---

[3] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

return to his past relevant work[4] based on an assessment of the claimant's residual functional capacity (RFC)[5] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. Id. However, if the claimant cannot perform his past work, the burden shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience, and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); Powers v. Apfel, 207 F.3d 431, 436 (7th Cir. 2000) (citing Bowen v. Yuckert, 482 U.S. 137, 146, n.5 (1987)); Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all the claimant's impairments so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." Id. If the ALJ finds that the claimant is not

---

[4] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[5] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. Id. (footnote omitted).

capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## IV. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in SGA since the alleged onset of his disability. (R. at 11-12.) At steps two and three, the ALJ found that Plaintiff had the severe impairments of degenerative disc disease ("DDD") of the spine and obesity, but that these impairments did not meet or equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, as required for the award of benefits at that stage. (R. at 12-13.) The ALJ next determined that Plaintiff had the RFC to perform light work that involved no climbing ladders, ropes, or scaffolds, and other postural activities only occasionally; and that avoided concentrated exposure to workplace hazards, such as moving machine parts and unprotected heights. (R. at 13-25.)

The ALJ then determined at step four of the analysis that Plaintiff could perform his past relevant work as a golf course patroller, bartender, and sales representative, because such work did not require activities precluded by Plaintiff's RFC. (R. at 25-26.) Because the ALJ determined that Plaintiff was capable of performing his past relevant work, it was unnecessary to pursue the analysis to step five in which the Commissioner would have had the burden to show that, considering the claimant's age, education, work experience, and RFC, the claimant was capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f); 404.1520(f); Powers v. Apfel, 207 F.3d 431, 436 (7th Cir. 2000) (citing Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987)); Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). Accordingly, the ALJ concluded that Plaintiff was not disabled and was employable such that he was not entitled to benefits. (R. at 17.)

Plaintiff moves for a finding that he is entitled to benefits as a matter of law, or in the alternative, he seeks reversal and remand for additional administrative proceedings. (Pl.'s Mot. for Summ. J.) In support of his position, Plaintiff argues that the ALJ: (1) improperly discounted his credibility as to the nature and impact of his impairments; and (2) improperly rejected two of his treating physician's opinions. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 6-9.) Plaintiff also submits "new and material" medical evidence to the Court, arguing that it should be considered as proof of his disability. Id. Defendant argues in opposition that the Commissioner's final decision is supported by substantial evidence and application of the correct legal standard such that it should be affirmed. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") at 9-22.)

### A. Plaintiff's new evidence is not a valid basis for remand.

Plaintiff argues that his case should be remanded for further proceedings in light of "new and material" evidence submitted to the Court. (Pl.'s Mem. at 6-9.) Such evidence was not submitted to the ALJ or the Appeals Council. The evidence submitted consists of several treatment records, dated between November 5, 2009 and April 7, 2010. (Pl.'s Mem., Exhibit A ("Ex. A").) All of the new evidence was obtained after the ALJ's decision, and both before and after the Appeals Council decision. Plaintiff contends that the new evidence corroborates his allegations of disability, as well as the opinions of nurse practitioner ("NP") Anne Tapscott and Dr. Raquel Villavicencio, and ultimately demonstrates that the ALJ's decision is not supported by substantial evidence. (Pl.'s Mem. at 6-9.)

In determining whether the ALJ's decision was supported by substantial evidence, a district court cannot consider evidence which was not presented to the ALJ. Smith v. Chater, 99

F.3d 635, 638 n.5 (4th Cir. 1996) (citing U.S. v. Carlo Bianchi & Co., 373 U.S. 709, 714-15 (1963); Huckabee v. Richardson, 468 F.2d 1380, 1381 (4th Cir. 1972) (citing Vitek v. Finch, 438 F.2d 1157 (4th Cir. 1970) (noting that reviewing courts are restricted to the administrative record in determining whether the decision is supported by substantial evidence).

Although the Court cannot consider evidence which was not presented to the ALJ, the Act provides that the Court may remand a case for reconsideration in two situations. 42 U.S.C. § 405(g). The first is a "sentence four" remand, which provides that the "court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the cause for a rehearing." Id. The second is a "sentence six" remand, which provides that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Id.; see also Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985) (a reviewing court may remand a case on the basis of newly discovered evidence if four prerequisites are met: (1) the evidence must be relevant to the determination of disability at the time the application was first filed and not be merely cumulative; (2) the evidence must be material; (3) there must be good cause for failure to submit the evidence before the Commissioner; and (4) the claimant must present to the remanding court a general showing of the nature of the new evidence.). Because Plaintiff has offered new evidence to the Court, the Court will address whether Plaintiff has fulfilled the requirements to justify a sentence six remand.

New evidence must relate to the determination of disability *at the time the application*

*was first filed*, and it must not concern evidence of a later-acquired disability, or of the "subsequent deterioration of the previously non-disabling condition." Szubak v. Sec'y of Health & Human Services, 745 F.2d 831, 833 (3rd Cir. 1984) (citing Ward v. Schweiker, 686 F.2d 762, 765 (9th Cir. 1982); see also Borders, 777 F.2d at 955. Evidence must also be material to the extent that the Commissioner's decision "'might reasonably have been different'" had the new evidence been before him. Borders, 777 F.2d at 955-56 (quoting King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)).

Here, it appears that the new evidence addresses possible "subsequent deterioration of the previously non-disabling condition," and is not relevant to the ALJ's decision of September 30, 2009. Szubak, 745 F.2d at 833. Specifically, though the new evidence documents Plaintiff's ongoing treatment, and a surgery in January 2010, such evidence does not suggest how Plaintiff's condition may have affected his RFC prior to the ALJ's decision. Further, none of the newly submitted evidence demonstrates how Plaintiff's RFC was affected after the ALJ's decision.

Plaintiff argues that his case is similar to the facts in Borders. (Pl.'s Mem. at 6-9; 777 F.2d 954.) In Borders, the plaintiff underwent two lumbar laminectomies[6] to address her pain in her lower back and left hip. 777 F.2d at 955. The ALJ found that the plaintiff suffered from disabling impairments for at least six months, but discounted her claims of continuing pain following her second surgery. Id. The ALJ found the plaintiff capable of sedentary work before the expiration of the twelve month period following the commencement of disability, and therefore denied her claims for benefits. Id. The plaintiff then underwent a third lumbar

---

[6] A laminectomy is the excision of the posterior arch of a vertebra. Dorland's at 1017.

laminectomy following the Commissioner's decision.  Id.  The Fourth Circuit remanded the case

for further proceedings in light of the new evidence of the third operation, finding that the

plaintiff's third operation tended to show that the first two operations had not sufficiently

corrected her impairments so as to permit her to perform sedentary work.  Id.  Because the

plaintiff had made a prima facie case of disability to perform her past relevant work, the burden

had shifted to the Commissioner to demonstrate that she could perform sedentary work.  Id.  The

Fourth Circuit also noted that the evidence might lend significant objective support to the

plaintiff's subjective complaints of disabling pain.  Id. at 955-56.

However, Plaintiff's claim is distinguishable from that of the plaintiff in Borders.  Here,

Plaintiff had not undergone any surgery prior to the ALJ's decision.  Also, the ALJ did not find

that Plaintiff had suffered from severe impairments that were disabling for any amount of time,

as opposed to the ALJ in Borders, who found that the plaintiff had disabling impairments for at

least six months.  (R. at 9-26; 777 F.2d at 955.)  The ALJ instead found that at all times relevant

to the claim of disability, Plaintiff was capable of performing light work with some restrictions.

(R. at 13-26.)  Further, the burden never shifted to the Commissioner at step five to demonstrate

that there were occupations that Plaintiff could perform which existed in significant numbers in

the national economy, as the ALJ found Plaintiff capable of performing his past relevant work as

a golf course patroller, bartender, and sales representative.  (R. at 25-26.)

A review of the new evidence reveals that on November 5, 2009, Plaintiff visited his

neurosurgeon for re-evaluation.  (Ex. A at 16.)  Treatment records indicate that he received an

injection in his shoulder from orthopedics, but he noted that it had not helped much; that he was

only taking the medication naproxen (Aleve); that neurosurgery wanted an orthopedics opinion

"before offering him what would most likely be a multilevel anterior cervical fusion"; that orthopedics had no further plans for Plaintiff until his neck was operated on; that an operation on his neck would be offered primarily to relieve his arm pain, as arthritic changes in his neck would not respond as well to surgical intervention; and that they would obtain an updated MRI before discussing surgical options. (Ex. A at 16-17.) Plaintiff underwent an MRI on December 3, 2009. Id. at 14. Records from that testing day indicate that Plaintiff reported having pain in his right shoulder and neck for the past nine months. Id. at 11. Records further indicate that although surgery on his cervical spine would not guarantee significant improvement in his neck pain, such a procedure might help alleviate his shoulder pain, and surgery was thereupon scheduled for January 8, 2010. Id. at 12. Plaintiff's only medication listed was naproxen (Aleve). Id.

Plaintiff underwent a multi-level cervical spine fusion[7] on January 8, 2010. Id. at 8. Treatment notes from Plaintiff's January 21, 2010 follow-up visit indicate that he was generally doing well; he had good strength in his upper and lower extremities; he would continue with his collar; and he was given a refill of his Percocet prescription, but not the Valium. Id. at 5. Treatment notes from February 24, 2010 indicate, again, that Plaintiff was generally doing well; he had been compliant with his collar; though he reported some right shoulder pain, he also reported that overall he was doing well; he had good strength in his upper and lower extremities; he would be weaned from his collar; he had been off of narcotics for three weeks because the supply was exhausted; and he would not restart the narcotics, but instead could alternate Tylenol

---

[7]A cervical spinal fusion is performed "to correct instability when traumatic vertebral fractures do not heal with other techniques." Dorland's Illustrated Medical Dictionary 763 (31st ed. 2007).

and an anti-inflammatory medication.  Id. at 3-4.  Notes from April 7, 2010 indicate that Plaintiff reported stiffness in his neck, though that was to be expected following his multi-level fusion, and that he also reported significant right shoulder pain.  Id. at 1.  The notes further indicate that the Plaintiff was referred to physical therapy for his neck and that he was to return to orthopedics for re-evaluation of his shoulder.  Id. at 2.

Though the new records indicate more than "conservative" treatment, as Plaintiff underwent surgery, the new evidence fails to indicate how the impairments affected his ability to work prior to the ALJ's decision, or even after the ALJ's decision.  Furthermore, the new records Plaintiff submits to the Court appear to demonstrate a deterioration of his previously non-disabling condition over time.  Plaintiff underwent an MRI in December 2009 to update his November 2008 MRI, and after obtaining the results of such, his neurosurgeon scheduled him for surgery.  (Ex. A at 11-12, 14-17.)  Plaintiff's November 2008 MRI revealed borderline spinal stenosis[8] and "significant narrowing" of the right neural foramen at C3-C4, yet December 2009 notes indicate that he had mild spinal stenosis and "severe" right neural foraminal narrowing ("NFN").[9]  (R. at 363-64, Ex. A at 14-15.)  Also in November 2008, Plaintiff's MRI revealed no significant encroachment on his spinal canal or neuroforamina at C4-C5; borderline spinal stenosis at C5-C6; and "minimal disc osteophyte complex...without significant encroachment on

---

[8] Spinal stenosis is the "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina [natural openings or passages] of the lumbar spine caused by encroachment of bone upon the space."  Dorland's at 737, 740, 1795.  The condition may be either congenital or due to spinal degeneration.  Id.

[9] Neural foraminal narrowing, or NFN, is the narrowing of the openings nerves pass through.  Dorland's at 737, 740, 1281 (defining "neural" as pertaining to the nerves, and "foramina" as natural openings or passages); http://www.stenosis-foraminal.com/neural_foraminal_narrowing.

the spinal canal or neural foramina" at C6-C7. (R. at 363-64.) Overall, the evidence indicates that Plaintiff had borderline spinal stenosis at C3-C4 and C5-C6, and degenerative changes at C4-C5 and C6-C7. Id. In December 2009, Plaintiff's new evidence indicates that he suffered from moderate left and mild right NFN at C4-C5; moderate right and severe left NFN and moderate spinal stenosis at C5-C6; and mild spinal stenosis and mild bilateral NFN at C6-C7. (Ex. A at 14-15.) Notes indicate that the overall impression was mild spinal stenosis at C3-C4 and C6-C7, and moderate stenosis at C5-C6 secondary to multi-level degenerative changes. Id. Nevertheless, this Court cannot make any finding as to whether Plaintiff's condition has, in fact, deteriorated. If Plaintiff believes his condition has deteriorated since the ALJ's decision, his proper remedy is to file a new application and submit the additional evidence in support of his application.

Furthermore, the Court is not persuaded that the ALJ's decision might reasonably have been different had the new evidence been before him. Though the ALJ did note the "generally routine and conservative treatment" Plaintiff obtained, and that his impairments had not required surgery, such was not the only reason for denying Plaintiff's claims. (R. at 14, 16, 25.) Instead, after review of all the evidence, the ALJ found that Plaintiff was not entirely credible for a multitude of reasons, and that the opinions of multiple physicians were consistent with the ALJ's overall conclusion that Plaintiff was capable of performing his past relevant work. (R. at 12-26.) To remand Plaintiff's case only because the ALJ noted Plaintiff's routine and conservative treatment, without any surgery, would be in error. The ALJ was required to consider the entire record, not just selective portions. For the reasons discussed earlier, and the elaboration that follows, it is the Court's recommendation that Plaintiff's case not be remanded to consider newly

submitted evidence, as such evidence is not relevant or material to Plaintiff's determination of disability at the time he first filed his application. Accordingly, it is the conclusion of this Court that the newly submitted evidence fails to meet the requirements for a sentence six remand.

**B.     The ALJ's conclusion that Plaintiff was not entirely credible is supported by substantial evidence.**

Plaintiff argues that in light of the new evidence submitted with his Motion, the ALJ's decision regarding Plaintiff's credibility is not supported by substantial evidence. (Pl.'s Mem. at 6-9.) Because it is the Court's recommendation that the new evidence is not relevant or material to Plaintiff's claim before the ALJ, the Court will only evaluate the ALJ's credibility determination based on the evidence of record.

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(5)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. <u>Craig v. Charter</u>, 76 F.3d 585, 594 (4th Cir. 1996); <u>see also</u> SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. <u>Id.</u>; SSR 96-7p, at 1-3. The ALJ must consider all the medical evidence in the record. <u>Craig</u>, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3; <u>see also</u> SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on *all* of the relevant evidence in the case record") (emphasis added). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part

of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. Craig, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements. Craig, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. See Eldeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997). The Court of Appeals for the Fourth Circuit (as the immediate controlling appellate authority for this Court) has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" Id. (quoting NLRB v. Air Prods. & Chems., Inc., 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" Id. (quoting NLRB v. McCullough Envtl. Servs., Inc., 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, it is well established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff is disabled. See Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." Craig, 76 F.3d at 591.

The ALJ found that Plaintiff suffered from impairments that could reasonably be

expected to produce some symptoms and limitations, but that Plaintiff's statements as they related to the intensity, persistence, and limiting effects of such symptoms were not credible to the extent that they were inconsistent with the ALJ's RFC determination. (R. at 16.) The ALJ provided a number of reasons as to why he concluded that Plaintiff was not entirely credible. For example, the ALJ noted that Plaintiff had made a number of inconsistent statements that were contradicted by other evidence of record regarding his use of alcohol, "which significantly undermined his credibility." (R. at 16.) Plaintiff testified that he had not consumed alcohol since the first week of January 2008; before then he would drink approximately two fifths of bourbon weekly. (R. at 41-42, 56-57.) On January 14, 2008, Plaintiff requested a pill from his physician to abstain from drinking, but he did not receive any such prescription; he was also noted to have a history of alcoholism. (R. at 42, 202.) On February 22, 2008, treatment records indicate that Plaintiff consumed four beers per day. (R. at 223.) On April 22, 2008, Plaintiff reported that he was drinking four to eight beers per day. (R. at 249-50.) Plaintiff reported to one of his treating physicians in November 2008 that he used to drink a fifth of 80 proof alcohol daily, but that he stopped doing so ten months earlier. (R. at 358.)

Also, Plaintiff claimed he never received unemployment benefits, though the record indicates that he received five hundred eighty dollars ($580.00) in such benefits in the second quarter of 2008, which was after the alleged onset date of disability. (R. at 55, 138.) As the ALJ noted, an individual must hold himself out as ready, willing, and able to accept employment if available to be eligible for unemployment benefits. (R. at 12.) The ALJ also noted that a claim for and continuing receipt of such benefits is inconsistent with a claim for disability benefits, for which an individual must represent that he is unable to perform any SGA. (R. at 12.)

Consequently, the ALJ found that Plaintiff's denial of receiving unemployment benefits also adversely impacted his overall credibility. (R. at 12.)

Finally, the ALJ concluded that the medical evidence did not comport with Plaintiff's allegations of disabling symptoms.[10] (R. at 16-25.) The ALJ engaged in a thorough discussion of Plaintiff's medical records, ultimately finding that the objective evidence demonstrated that Plaintiff had only mild impairments. (R. at 16-25.) For example, on January 14, 2008, treatment records from Dr. Dan Johnson[11] indicate that Plaintiff requested a work note. (R. at 202.) The evidence reveals that Dr. Johnson spent an "extensive amount of time" informing Plaintiff that the work note was only at his (Plaintiff's) recommendation, and that Dr. Johnson did not feel comfortable prohibiting Plaintiff from working for prolonged periods of time. (R. at 202.) On February 22, 2008, a different physician, Dr. Shawn B. Clark, provided Plaintiff with a work note which stated that he was unable to return to work from February 22, 2008 to March 3, 2008. However, the treatment notes from that visit indicate that Dr. Clark understood Plaintiff's work to be lifting heavy equipment in air conditioning supply, not Plaintiff's past relevant work as a

---

[10] Though Plaintiff argues that his case should be remanded so the ALJ can consider additional new evidence because the ALJ relied on Plaintiff's "generally routine and conservative treatment" in finding him not entirely credible, it appears that the ALJ added this rationale almost as an afterthought. In the ALJ's decision, after initially questioning Plaintiff's credibility regarding the receipt of unemployment benefits, and extensive discussion regarding his alcohol use, the ALJ stated, "[m]oreover, the claimant's treatment record does not support his allegations regarding the severity of his limitations." (R. at 12-16, 24.) Because the ALJ's credibility determination is to be given great deference, it is the Court's recommendation that even if presented with evidence of surgery, the ALJ's credibility determination would still be supported by substantial evidence and application of the correct legal standard, given the ALJ's multiple reasons for finding Plaintiff not entirely credible.

[11] It appears that the January 14, 2008 visit was Plaintiff's second visit to Dr. Johnson, his first being on January 8, 2008. (R. at 202-04.)

golf patroller, bartender, or sales representative.  (R. at 240.)  On March 18, 2008, Dr. Clark

issued another work note, excusing Plaintiff from work from March 4, 2008 to April 11, 2008.

(R. at 233.)  Nevertheless, on April 10, 2008, Dr. Clark indicated that he could not see any

structural reason why work would be unsafe for Plaintiff.  (R. at 231.)

The ALJ noted that Plaintiff's medical records exhibited "a pattern of switching from one

doctor to another in order to acquire excuses for not working his job."  (R. at 24.)  The ALJ also

noted that health care providers must rely heavily upon a patient's truthful recitation of his

subjective symptoms, and that there was "considerable evidence in [the] record that [Plaintiff] is

far less than candid with his health care providers."  (R. at 16, 24.)  The ALJ further noted that

"[i]f all of [Plaintiff's] treating, examining, and reviewing physicians and mental health

professionals were fully aware of [Plaintiff's] credibility question, that undoubtedly would have

impacted their opinions about his health condition."  (R. at 16.)

On March 18, 2008, Dr. W. Miles Wallace indicated that he could not find any

electrodiagnostic evidence in Plaintiff to conclude that he suffered from right carpal tunnel

syndrome or cervical radiculopathy.  (R. at 234.)  On April 22, 2008, Dr. Purvez discussed anti-

inflammatories with Plaintiff and provided him with a prescription of an arthritic pain reliever

Arthrotec.  On June 25, 2008, DDS physician Dr. Tony Constant opined that Plaintiff had

pursued appropriate follow-up care for his impairments, and that treatment was "generally

successful" in controlling his symptoms.  (R. at 285.)  On September 16, 2008, Dr. Robert

Chaplin affirmed Dr. Constant's opinion that Plaintiff was capable of performing light work.  (R.

at 336.)  The ALJ also discussed Plaintiff's November 2008 MRI, noting that it indicated "at

most" borderline spinal stenosis at C3-C4 and C5-C6, that there was no evidence of abnormal

disc signal intensity or enhancement, and that it showed degenerative changes that "all persons acquire as they age." (R. at 25, 363-64.)

Because the ALJ considered all the evidence, both subjective and objective, before making his credibility determination, it is the Court's recommendation that his decision is supported by substantial evidence and application of the correct legal standard. The ALJ provided multiple reasons for concluding that Plaintiff was not entirely credible. Therefore, his decision in this regard should be affirmed.

> **C.      The ALJ's finding that NP Anne Tapscott's and Dr. Raquel Villavicencio's opinions were not entitled to controlling weight is supported by substantial evidence and application of the correct legal standard.**

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. See 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the Plaintiff's treating physician(s), consultive examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. See 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d). Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if it is well-supported by medically-acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with other substantial evidence in the record. Craig, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, e.g., when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. Jarrells v. Barnhart, No. 7:04-CV-00411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005). See 20 C.F.R. § 404.1527(d)(3)-(4), (e).

The ALJ noted that since there are no objective tests for pain or mental status, physicians and mental health professionals must rely heavily on their patient's credibility. (R. at 16.) The ALJ further noted that "[i]f all of [Plaintiff's] treating, examining, and reviewing physicians and mental health professionals were fully aware of [Plaintiff's] credibility question, that undoubtedly would have impacted their opinions about his health condition." (R. at 16.) As noted earlier, the ALJ found that Plaintiff's credibility was "significantly undermined." (R. at 16.) With regard to Dr. Villavicencio and NP Tapscott, the ALJ found that their opinions were not supported by the longitudinal record, including their own treatment notes and the opinion of Plaintiff's treating neurosurgeon who had stated that Plaintiff could work. (R. at 14, 231, 341-58, 369-71.)

Dr. Villavicencio opined on December 16, 2008, that because of Plaintiff's spinal stenosis and degenerative disc disease, he could only lift less than ten pounds; could stand or walk only twenty minutes in an eight-hour day; could only sit for forty-five minutes without interruption; could never climb, stoop, crouch, kneel, or crawl; could occasionally balance; that pain limited his ability to reach, handle, feel, push, and pull; and that heights and moving

machinery may cause Plaintiff pain.  (R. at 341-43.)  However, as the ALJ noted, Dr.

Villavicencio had only seen Plaintiff three times, she endorsed his disability on the second visit,

and she did so without the results of a neurological consultation.  (R. at 14, 341-58.)  On

Plaintiff's first visit, November 11, 2008, records reflect that he was to continue treatment with

his neurosurgeon regarding his spinal stenosis, that he was referred to physical therapy, and that

he was to try a lidocaine patch for his pain.  (R. at 360.)  On December 16, 2008, records from

Dr. Villavicencio reflect that Plaintiff's pain was uncontrolled, but that he had not filled the

medications prescribed to him in the previous visit, nor had he sought the neurosurgery consult.

(R. at 352.)  Records further reflect that the physician "stressed the importance of both."  (R. at

352.)  The records also indicate that Plaintiff had not engaged in physical therapy either, and that

he was therefore issued a new referral, as well as a prescription for the medication diclofenac.

(R. at 352-54.)  That same day, Dr. Villavicencio completed a medical assessment of ability to

do work-related activities, as noted earlier.  (R. at 341-43.)  The final treatment records from Dr.

Villavicencio, dated March 10, 2009, indicate that Plaintiff did not initially fill his prescription

for diclofenac and was uncertain whether he had tried to do so at all; that Plaintiff still had not

been to physical therapy and was given another referral for such; that Plaintiff had been to

neurosurgery, but that he would not have surgery unless his later-scheduled EMG was positive;

and that his November 2008 MRIs revealed degenerative changes and borderline spinal stenosis

at C3-C4 and C5-C6.  (R. at 346-49.)  The ALJ concluded that Dr. Villavicencio's assessments

appeared to be more based upon Plaintiff's reported symptoms and limitations, rather than on

objective findings and diagnostic test results.  Accordingly, the ALJ afforded only little

evidentiary weight to her opinion.  (R. at 14, 25.)

NP Tapscott completed a medical assessment of ability to do work-related activities on May 28, 2009, opining that Plaintiff could lift and carry ten pounds; Plaintiff could stand and/or walk two hours in an eight hour work day, but for only fifteen minutes without interruption; Plaintiff could sit for two hours without interruption in an eight hour day; Plaintiff's ability to balance and stoop would occasionally be affected; Plaintiff's abilities to reach, handle, feel, push, and pull would be affected in his right arm; and Plaintiff had environmental restrictions, namely heights and moving machinery, caused by his impairments. (R. at 369-71.) NP Tapscott also indicated that the form was completed "per [Plaintiff's] stated abilities." (R. at 371.) As noted earlier, the ALJ found Plaintiff's credibility significantly questionable. The ALJ also noted that NP Tapscott's opinion was not based on objective findings and diagnostic test results, that NP Tapscott had "admitted as much," and that no contemporaneous treatment records accompanied NP Tapscott's assessment. (R. at 14.) The ALJ afforded her opinion little evidentiary weight. (R. at 25.)

There is substantial evidence to support the ALJ's conclusion that the assessments were not entitled to controlling weight. For example, and as noted earlier, Plaintiff's neurosurgeon Dr. Clark opined on April 10, 2008 that he could see no structural reason why work would be unsafe for Plaintiff. (R. at 231.) On March 18, 2008, Dr. Wallace noted Plaintiff's EMG and never conduction studies of his right upper extremity were normal, and that he did not find electrodiagnostic evidence for right carpal tunnel syndrome or cervical radiculopathy. (R. at 234.) On April 22, 2008, Dr. Purvez prescribed an arthritic pain medication and discussed anti-inflammatories with Plaintiff after noting that his degenerative disc disease gave him more symptoms of facet syndrome than radiculopathy, and that his pain was related more to the facet

joint than to a radiculopathy. (R. at 269-71.) On June 25, 2008, DDS physician Dr. Constant opined that Plaintiff had the RFC for light work, finding that Plaintiff had pursued appropriate follow-up treatment for his impairments that were generally successful in controlling his symptoms. (R. at 279-85.) Dr. Chaplin affirmed Dr. Constant's assessment on September 16, 2008. (R. at 336.) Dr. Stringer, on November 7, 2008, noted degenerative changes and borderline spinal stenosis at C3-C4 and C5-C6. (R. at 363-64.) All such evidence was in addition to the ALJ having found Plaintiff's credibility highly questionable.

The ALJ properly determined that Dr. Villavicencio's and NP Tapscott's opinions were not entitled to controlling weight. Before making his decision, the ALJ properly considered the factors required by regulation, such as examining relationship, treatment relationship, length of treatment, and consistency. The ALJ's decision to afford such opinions little evidentiary weight is based on substantial evidence and application of the correct legal standards. Accordingly, it is the Court's recommendation that the ALJ's decision be affirmed.

## V. CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's motion for summary judgment (docket no. 12) and motion to remand (docket no. 13) be DENIED; that Defendant's motion for summary judgment (docket no. 15) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Robert E. Payne and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and**

23

**recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a <u>de novo</u> review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____/s/_____
DENNIS W. DOHNAL
UNITED STATES MAGISTRATE JUDGE

Date: October 20, 2010
Richmond, Virginia